**Reversed and Rendered in Part, Reversed and Remanded in Part, and Memorandum Opinion filed November 21, 2024**



In The

# Fourteenth Court of Appeals

---

## NO. 14-23-00249-CV

---

### WEST HARBOUR, LLC, Appellant

### V.

### ORLEANS HARBOUR HOMEOWNERS ASSOCIATION, INC., Appellee

---

**On Appeal from the 459th District Court**
**Travis County, Texas**
**Trial Court Cause No. D-1-GN-21-002835**

---

### MEMORANDUM OPINION

Appellant West Harbour, LLC appeals the judgment in favor of appellee Orleans Harbour Homeowners Association, Inc. (the Association).[1] In three issues, West Harbour contends that: (1) the evidence is legally and factually insufficient to

---

[1] This case is before this court as a transfer case from the Third Court of Appeals in Austin pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* Tex. Gov't Code §73.001(a). Because this is a transfer case, we apply the precedent of the Third Court of Appeals to the extent it differs from our own. *See* Tex. R. App. P. 41.3.

support the jury's finding of an easement by estoppel in favor of the Association; (2) the evidence is legally and factually insufficient to support the jury's finding that the Association adversely possessed a part of West Harbour's property; and (3) the trial court erred in granting the Association's plea to the jurisdiction. We reverse and render in part and reverse and remand in part.

## BACKGROUND

West Harbour and the Association are neighbors with a common boundary line. West Harbour owns the property referred to herein as Lot 35, while the Association owns the property referred to as Lot 34. In the 1950s, the prior owners of Lot 34 built a peninsula extending into the Colorado River. By the 1980s, the peninsula was largely underwater, and the Association sought to repair the peninsula and its wooden bulkhead. The Association considered two options. The first would involve significant excavation to remove existing concrete behind the visible wooden bulkhead on Lot 34. Though this option would be more costly, the entire peninsula would remain on Lot 34. The second was to build a new wall to the north of the existing wooden bulkhead, but because this would encroach upon Lot 35, the Association decided it needed permission from the owners of Lot 35. The second option would also save the Association money in construction costs and result in a more substantial peninsula.

The then-owners of Lot 35 and the Association agreed the second option was the best course of action, and a "Memo of Meeting" drafted by the Association's engineer was filed in the Travis County property records. According to the memo, the then-owners of Lot 35 "agreed that the most reasonable course of action was to build the new wall to the north of the existing wood bulkhead and that [they] would be concerned if [the Association] began excavation behind the wood bulkhead to

2

remove concrete debris." The Lot 35 owners also indicated that the Association "could construct [the new bulkhead] without resistance or obstruction from them."

With the new bulkhead, the Association "reclaimed a substantial portion of land that had been underwater for both Lots 34 and 35." After completing construction, the Association enjoyed use of the entire peninsula for recreation, fishing, and launching kayaks and canoes. Over time, the Association added landscaping, furniture, crushed granite, and a firepit to the peninsula.

In the 1990s, the Association built a cinderblock fence along what it believed to be the property line between Lot 34 and Lot 35. In 2014, the Association built a new wooden fence, "slightly moved due to a new survey." Though the Association did not intend to encroach upon Lot 35 with the construction of either fence, it acknowledges that a portion of the property enclosed by the new fence (referred to herein as "the Driveway Tract") does cross the Lot 35 boundary line.

In 2018, West Harbour purchased Lot 35, intending to develop the property into five single-home villas. To obtain municipal approval, West Harbour needed to plant vegetation and trees on Lot 35 to improve the "impervious cover ratio" in accordance with City of Austin regulations. West Harbour began landscaping its portion of the peninsula and sought to add "mitigation plants to the reclaimed surface at Lot 35's south boundary with the Association's property running along the peninsula, none of which would interfere with the Association['s] access to and enjoyment of its peninsula." West Harbour also removed old cinderblocks on Lot 35's side of the Association's wooden fence and installed planter boxes.

Additionally, West Harbour sought to install a low-profile ornamental fence on Lot 35's boundary along the peninsula "envisioned as a one-to-two-foot-high fence—to discourage use (and potential liability for West Harbour) by persons trespassing on the reclaimed surface directly from the [Colorado River]."

3

The Association disapproved of West Harbour's plan to make changes to the Lot 35 portion of the peninsula (Tract 1 in the survey below) and the Driveway Tract (Tract 2 in the below survey)[2] and filed suit.



_____

[2] Tract 2 is a very narrow triangular tract.

The Association's lawsuit asserted claims for declaratory relief, to quiet title, and for trespass. Specifically, concerning the peninsula, the Association sought a declaration that (1) the Association possessed an easement by estoppel or prescription providing exclusive easement rights to access and use the portion of the peninsula encroaching onto West Harbour's property (Tract 1) and (2) West Harbour has no legal right to interfere with or exclude the Association or its members from the use of any portion of the peninsula. Alternatively, the Association argued that it had acquired title to the peninsula via adverse possession and sought a judgment removing the cloud on the Association's title and quieting title to the peninsula. The Association likewise claimed that it had adversely possessed the Driveway Tract and sought a judgment removing the cloud on the Association's title and quieting title to the Driveway Tract. Lastly, the Association's petition sought (1) a declaration that the Association has title to and a fee simple interest in land south of the Holt Carson boundary line "undisputedly owned by [the Association]" and (2) an injunction ordering West Harbour to remove all encroachments installed south of the boundary line.[3]

West Harbour answered the Association's suit, asserting a general denial, specific denials, specific admissions, and affirmative defenses, and claiming that the Association lacked standing because it was not a party, successor-in-interest, or third-party beneficiary to the original agreement memorialized in the memo of meeting. The answer also asserted a counterclaim, seeking numerous declarations and reasonable and necessary attorney's fees and expenses. West Harbour later amended its counterclaim to seek the following declarations:

---

[3] The Association also sought and received a temporary restraining order prohibiting West Harbour from entering or accessing the disputed section of the peninsula or adding, removing, damaging, or otherwise disturbing any fixtures or property on the peninsula.

5

1. The true and correct location of the boundary between Lot 35 . . . and Lot 34 . . . is the stated and called boundary . . . as specifically shown on the Holt Carson survey . . . .

2. West Harbour is entitled to the right to access and to use its land known as Lot 35, as specifically shown on the Holt Carson survey . . . to the exclusion of [the Association] . . . .

3. [The Association] holds no easement over any part of Lot 35, as specifically shown on the Holt Carson survey . . . .

4. [The Association] does not own any portion of "Lot 34."

5. [The Association] does not hold title to nor own any portion of Lot 35, as specifically shown on the Holt Carson survey . . . .

6. West Harbour, LLC, owns Lot 35 as specifically shown on the Holt Carson survey . . . including all portions of Lot 35 contained within the surveyed boundary which extends along what is referred to as the peninsula.

7. All encroachments on Lot 35, as specifically shown on the Holt Carson survey . . . not removed voluntarily by any owner of Lot 34 may be removed without further notice.

The Association filed a plea to the jurisdiction, arguing that the trial court lacked subject matter jurisdiction over West Harbour's claim for a declaration concerning the true and correct boundary line, because the location of the boundary line was not in dispute. West Harbour argued that the Association had disputed the boundary line throughout the pendency of its suit and had only acquiesced to the boundary line in its plea to the jurisdiction. West Harbour sought a judgment on its declaratory judgment claim, based on the Association's admission. Following a hearing, the trial court granted the plea to the jurisdiction, and the case proceeded to trial.

Ultimately, the jury found in favor of the Association. Under an easement-by-estoppel theory, the jury found the Association has an easement over Lot 35's peninsula surface without unreasonable interference or exclusion by West Harbour. The jury also found that the Association held the Driveway Tract "in peaceable and adverse possession for a period of at least ten years before June 18, 2021." Within the jury charge, the "Disputed Driveway Strip" was defined as "the portion of Lot 35 on which the [Association] constructed and maintain a fence and driveway and over which the [Association] claim[s] ownership."

The final judgment rendered by the trial court awarded the Association an easement over the "Peninsula Strip" "for general recreational purposes" and found that West Harbour "has no legal right to unreasonably interfere with or exclude" the Association or its members from "the use of any portion of the Peninsula Strip." The final judgment also awarded the Association fee simple title to the "Driveway Strip described as 'Tract 2' in the attached survey." The judgment included a survey (the Delta Land survey, pictured above) and metes-and-bounds descriptions of each tract in dispute. This appeal followed.

## EASEMENT BY ESTOPPEL

In its first issue, West Harbour contends that the evidence is legally and factually insufficient to support an easement by estoppel in favor of the Association as to the "reclaimed surface of Lot 35 running along the north edge of the peninsula."

## A.    General Legal Principles

"Evidence is legally insufficient to support a jury finding when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere

7

scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact." *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 613 (Tex. 2016). In reviewing whether legally sufficient evidence supports a finding, we consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Id*. If there is more than a scintilla of such evidence, then the evidence is legally sufficient. *Id*.

A jury verdict that rests on legally sufficient evidence may nevertheless be defective on factual sufficiency grounds. "When reviewing an assertion that the evidence is factually insufficient to support a finding, a court of appeals sets aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, it determines that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered." *Id*. at 615. Before reversing on factual sufficiency grounds, this court is obligated to detail the relevant evidence and "state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (internal quotations omitted). The proper remedy when a verdict is factually insufficient is reversal and remand for a new trial. *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 626 (Tex. 2004).

Easement by estoppel (also known as estoppel in pais) is an equitable doctrine whereby courts may, in certain circumstances, prohibit a property owner from contesting the existence of an easement on his property where the owner has led another property owner to rely to his detriment on the easement's existence. *See Storms v. Tuck*, 579 S.W.2d 447, 451 (Tex. 1979); *Scott v. Cannon*, 959 S.W.2d 712, 720 (Tex. App.—Austin 1998, pet. denied). The basic elements for creation of an easement by estoppel are: (1) a representation communicated to a promisee; (2) the

8

communication is believed; and (3) reliance on the communication. *Scott*, 959 S.W.2d at 720. The Third Court of Appeals has also imposed an additional requirement to establish an easement by estoppel—"a vendor/vendee relationship." *Id.* ("[W]e believe after reviewing the cases, that the law requires a vendor/vendee relationship to establish an easement by estoppel.") (citing *Drye v. Eagle Rock Ranch, Inc.*, 364 S.W.2d 196, 209–10 (Tex. 1962); *Wilson v. McGuffin*, 749 S.W.2d 606, 610 (Tex. App.—Corpus Christi 1988, writ denied)).[4]

## B.   *Scott* Requires a Vendor/Vendee Relationship

West Harbour first argues that the Association's easement-by-estoppel argument fails because the Association did not and cannot prove a vendor/vendee relationship—an additional requirement for an easement by estoppel imposed by the Third Court of Appeals. *See Scott*, 959 S.W.2d at 720. As this is a transfer case, we must apply the precedent of the Third Court of Appeals. *See* Tex. R. App. P. 41.3.

In response, the Association argues that the vendor/vendee language in *Scott* is dicta because "[t]he Third Court ultimately determined that no representations were made by the owners or their predecessors." *See id.*; *see also S. Plains Lamesa R.R., Ltd. v. Heinrich*, 280 S.W.3d 357, 361 n.1 (Tex. App.—Amarillo 2008, no pet.) ("However, [*Scott*] was decided because the record did not conclusively show any affirmative representations as to the existence of an easement. Therefore, the language regarding a vendor/vendee relationship is *dicta*." (internal citations

---

[4] Other courts of appeals considering the issue have rejected the imposition of an additional requirement. *See Murphy v. Long*, 170 S.W.3d 621, 628 (Tex. App.—El Paso 2005, pet. denied) ("Because both [Texas supreme court decisions relied on in *Scott*] involved a claim by a purchaser of property, it would have been natural for the court to state the doctrine in terms of a purchaser. We do not read [those Texas supreme court decisions] as holding that an easement by estoppel can never exist unless there is a vendor-vendee relationship between the parties."); *S. Plains Lamesa R.R., Ltd. v. Heinrich*, 280 S.W.3d 357, 362 (Tex. App.—Amarillo 2008, no pet.) ("[A] vendor/vendee relationship is not required to prove that an easement was granted by estoppel . . . .").

omitted)). The Association asks us to seize upon *Scott*'s alternative reason for its conclusion and disregard the vendor/vendee holding as dicta. However, considering the language of *Scott* and later decisions from the Third Court of Appeals discussing or affirming *Scott*, we reject the Association's invitation to do so.

The Third Court of Appeals has addressed *Scott*'s vendor/vendee holding on two subsequent occasions and has declined to alter or narrow the holding in either case. In *Cambridge Holdings, Ltd. v. Cambridge Condominium Council of Owners*, No. 03-08-00353-CV, 2010 WL 2330356 (Tex. App.—Austin June 11, 2010, no pet.) (mem. op.), the court noted *Scott*'s holding "that a vendor-vendee relationship must exist to establish an easement by estoppel," and although it acknowledged that "some of [its] sister courts [had] since questioned that holding," it nevertheless declined to revisit the issue, though expressly urged to do so by the appellant. *Id.* at *16–17.

Later, in *Pewitt v. Terry*, No. 03-12-00013-CV, 2012 WL 4052135 (Tex. App.—Austin Sept. 13, 2012, no pet.) (mem. op.), the court reaffirmed *Scott*'s holding and rejected the appellee's claims of an easement by estoppel based on the lack of evidence of a vendor/vendee relationship. *Id.* at *4.[5] ("[T]his Court has held that a vendor/vendee relationship must exist between the party making the representation and the party claiming to have relied on it" to establish an easement by estoppel).

The Association asks this court to limit the holding of *Scott* to cases in which no affirmative representations are made. However, the *Scott* decision was not so narrowly applied, and the Association points to no cases in which the Third Court of

---

[5] *Pewitt* also noted that the appellee presented no evidence of any representations relied upon to their detriment in concluding that the evidence presented at the temporary injunction hearing did not support a finding of an easement by estoppel. *Pewitt v. Terry*, No. 03-12-00013-CV, 2012 WL 4052135, at *4 (Tex. App.—Austin 2012, no pet.) (mem. op.).

Appeals has so limited the *Scott* holding. Rather, later cases expressly acknowledge the breadth of the *Scott* holding. *See Cambridge Holdings, Ltd.*, 2010 WL 2330356, at *17; *Pewitt*, 2012 WL 4052135, at *4–5; *see also Murphy v. Long*, 170 S.W.3d 621, 628 (Tex. App.—El Paso 2005, pet. denied) ("[T]he Third Court of Appeals is the only court to hold that the doctrine *never* applies outside of the vendor-vendee relationship." (emphasis added)); *Weddington v. Vaughn*, No. 07-24-00120-CV, 2024 WL 3588585, at *2 (Tex. App.—Amarillo July 30, 2024, no pet.) (mem. op.) ("Since *Scott* was decided, the Third Court has reiterated that there can be no easement by estoppel unless a vendor-vendee relationship exists between the plaintiff and defendant.").

"Transferee courts must follow whatever law binds the transferor court, even if there is reason to suspect that a transferor court might disregard that law." *Mitschke v. Borromeo*, 645 S.W.3d 251, 258 (Tex. 2022). It is undisputed there is no vendor/vendee relationship between West Harbour and the Association. *See Scott*, 959 S.W.2d at 720. As a result, we sustain West Harbour's first issue.

## C.     Whether the Association Otherwise Proved Easement by Estoppel

As we have determined that *Scott*'s vendor/vendee holding is dispositive in this transfer case, the Association asks us to indicate whether we would have decided the easement-by-estoppel question differently if not bound by Third Court of Appeals precedent. *See* Tex. R. App. P. 41.3 ("The court's opinion may state whether the outcome would have been different had the transferee court not been required to decide the case in accordance with the transferor court's precedent.").

Although this court has not directly addressed *Scott*'s vendor/vendee relationship holding, our case law suggests a reluctance to impose such a requirement. *See Stallman v. Newman*, 9 S.W.3d 243, 246–47, 248 n.2 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (noting *Scott*'s vendor/vendee requirement

11

and concluding that "where, as here, there is no vendor/vendee relationship, an easement by estoppel cannot arise from passive acquiescence alone" but requires some affirmative misrepresentation; however, court declined to hold that easement by estoppel could never arise without vendor/vendee relationship); *Mack v. Landry*, 22 S.W.3d 524, 530 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (noting *Stallman*'s "reluctance to hold that a vendor/vendee relationship is a necessary prerequisite to an easement by estoppel where a party has relied to his detriment upon an affirmative misrepresentation").

If this court decided this case under its own precedent, we would not need to reach the question of whether a vendor/vendee relationship is required to establish an easement by estoppel because the "general recreational" easement awarded to the Association was not supported by legally sufficient evidence. As a result, we would reverse and render judgment in favor of West Harbour on this claim.

West Harbour argues that, aside from the agreement of the Lot 35 owners that the Association could construct the new bulkhead and peninsula "without resistance or obstruction," there were no representations regarding whether the Association could use any part of the peninsula on Lot 35's side for "general recreation." West Harbour argues that quiet acquiescence to the use of the peninsula for recreation is never enough to grant the awarded "recreational" easement by estoppel where there is no vendor/vendee relationship. The Association identifies only the "express permission by the owners of Lot 35" from the Memo of Meeting as establishing the "representation" element of their claim.

We agree with West Harbour that the representation that the Association "could *construct* the new [bulkhead] north of the existing wooden bulkhead without resistance or obstruction from [it] (or any other owners of Lot 35)" was not a grant of permission to the Association to use Lot 35's portion of the peninsula for

12

"recreational purposes." There is no evidence that any Lot 35 owners represented or acted in a way to support the awarded easement by estoppel. There is no evidence that the Association ever discussed with the then-owners of Lot 35 its intention to use Lot 35's portion of the peninsula (once rebuilt) for general recreational purposes. *See Lakeside Launches, Inc. v. Austin Yacht Club, Inc.*, 750 S.W.2d 868, 872 (Tex. App.—Austin 1988, writ denied) ("In order to create an easement by estoppel, something must be said or done by the owner of the servient estate at the time of the grant of the dominant estate that induces the acceptance of the grant.")

Like in *Scott*, we cannot say on this record as a matter of law that the Lot 35 owners affirmatively represented to the Association that an easement existed to *use* the peninsula once constructed. *See Scott*, 959 S.W.2d at 720–21. Rather, the Lot 35 owners gave express consent to the Association to *construct* the peninsula without obstruction or resistance. At most, there was a passive acquiescence on the part of the Lot 35 owners that was relied upon by the Association for recreational use of the peninsula after it was constructed. *See id*. Such acquiescence, no matter for how long, does not estop West Harbour from denying the Association's claim of an easement by estoppel. *See id*; *see also Stallman*, 9 S.W.3d at 247 (stating that though Stallmans gave Newman permission to use road, permissive use was inconsistent with Newman's claim of "legal right to use road"; court held that without vendor/vendee relationship, easement by estoppel cannot arise from passive acquiescence alone); *Tice v. Hunt*, No. 11-08-00099-CV, 2010 WL 1948602, at *6 (Tex. App.—Eastland May 13, 2010, no pet.) (mem. op.) (holding no easement by estoppel where appellant failed to present any evidence of representation element; evidence showing permission to move road did not amount to representation that appellant would receive easement in road, as "permission implies the right to revoke that permission").

13

## ADVERSE POSSESSION

In its second issue, West Harbour argues the evidence is legally and factually insufficient to support the judgment's award of the Driveway Tract to the Association in fee simple based on the jury's finding of adverse possession. West Harbour raises several sufficiency arguments concerning the evidence supporting the various elements of adverse possession. West Harbour also argues that the evidence does not support the trial court's judgment because the survey incorporated by the judgment does not reflect the agreed-to boundary line or the portion of land the Association claims it has adversely possessed.

## A.    General Legal Principles

Adverse possession is "an actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person." Tex. Civ. Prac. & Rem. Code § 16.021(1). To succeed on an adverse possession claim under section 16.026(a), the following elements must be established by a preponderance of the evidence: (1) actual and visible possession of the disputed property; (2) that is adverse and hostile to the claim of the owner of record title; (3) that is open and notorious; (4) that is peaceable; (5) that is exclusive; and (6) involves continuous cultivation, use, or enjoyment for ten years. *Kazmir v. Benavides*, 288 S.W.3d 557, 561 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *see also* Tex. Civ. Prac. & Rem. Code § 16.026(a). The ten-year period begins to run on the date the adverse possessor actually and visibly appropriates the claimed land. *Kazmir*, 288 S.W.3d at 561. Whether adverse possession has been established is usually a question of fact. *Id*.

## B.      The Association's Fence and the Driveway Tract

In the 1990s, the Association built a fence on what it believed to be the property line between Lot 34 and Lot 35 to "demark and delineate the property" and "indicate[] the private property line." This wooden fence rested on a low cinderblock barrier that supported the fence. The fence remained on the edge of the Association's driveway from the "1990s" to 2014. In 2014, the Association obtained a survey which revealed that the fence was not entirely on the property line and encroached upon Lot 35 in certain locations. The Association proceeded to replace the fence in 2014, but moved it from its original location as a result of the new survey—"slightly on the south side of that existing fence, probably one or two feet." After the Association moved the fence, the original cinderblock supports remained on West Harbour's side of the fence. West Harbour removed the cinderblocks and installed planter boxes.[6]

Regarding the fence, the Association's representative, James Welch, testified that no one other than the Association has "ever used the land south of *that fence line* in all of the 30-plus years" he has lived on Lot 34. The fence is nine feet high and has signs that indicate the driveway is for parking for residents and their guests only.

Neither the judgment nor the parties is precise as to what portion of the Driveway Tract is at issue. The jury charge defined the "Disputed Driveway Strip" as "the portion of Lot 35 on which the [Association] constructed and maintain[ed] a fence and driveway over which the [Association] claim[s] ownership." The judgment in turn awarded to the Association "fee simple title to the Driveway Strip

---

[6] Welch testified that although he found it "rather disturbing" that West Harbour would tear the cinderblocks out without asking, now that West Harbour has installed planter boxes, "[i]t doesn't seem neighborly or reasonable to ask someone to tear that out. We're not actively using that one or two feet of property."

described as 'Tract 2' in the attached survey labeled as Exhibit A, said survey being the same survey admitted into evidence at trial as PX 15." However, the survey attached to the trial court's judgment is not the survey stipulated to by the parties— the parties stipulated to the boundary line set forth in the Holt Carson survey, but the trial court attached the Delta Land survey to its judgment.

The Association attempts to clarify by conceding that it does not seek any portion of Lot 35 previously enclosed by the old fence (delineated by the cinderblocks) which is now north of the 2014 wooden fence. The Association contends that it is concerned only with any portion of Lot 35 encroached upon by the new 2014 fence.

## C. Intent

First, West Harbour argues that because the Association admitted it "did not intend to encroach on Lot 35 when it built the cinderblock wall" it has failed to prove a necessary element of its claim for adverse possession. West Harbour compares this case to *Ellis v. Jansing*, wherein the Supreme Court of Texas held that "[m]ere occupancy of land without any intention to appropriate it will not support the statute of limitations. . . . [Possession] cannot be adverse unless accompanied by the intent on the part of the occupant to make it so." 620 S.W.2d 569, 571–72 (Tex. 1981). *Ellis* is distinguishable from the present case for several key reasons. First, the two adjoining lots in *Ellis* originally shared a common owner. *Id.* at 569. Before the lots were divided, the common owner erected a concrete retaining wall, topped by a chain-link fence, which was the only barrier or obstruction ever built on the land (neither lot was fenced by the subsequent owners). *Id.* at 569, 571. Ultimately, the Jansings, as later owners of Lot 3 (west of Lot 4) claimed adverse possession of a fifteen-foot easement between the two parcels, as well as the three-foot strip of land between the easement and the concrete retaining wall (both the easement and the

16

three-foot strip were on Lot 4's side of the boundary line). *Id.* at 570–71. The Jansings essentially claimed all the land on their side of the boundary up to the concrete wall. *Id.* The Jansings' predecessor in title testified that though he believed the wall delineated the boundary line, he did not intend to claim "any property owned by the abutting property owners." *Id.* at 571.

Thus, in *Ellis*, the party claiming adverse possession was not (as here) the party erecting the fence with some intention to keep his neighbor out. *Id*. The adverse possessors in *Ellis* never erected any fence or obstruction, or otherwise used the land in a manner inconsistent with or hostile to their neighbor's ownership. *Id*.

This case is more akin to *Mason Building Ass'n of Houston, Inc. v. McWhorter*, 177 S.W.3d 465 (Tex. App.—Houston [1st Dist.] 2005, no pet.). *McWhorter* concerned a fence line between 32 Pinedale and the Masonic Building Association (MBA). *Id.* at 468. 32 Pinedale consisted of three sections: the front, middle, and rear. *Id.* The front section was bounded by a hedge, the middle by an older wooden fence, and the rear by a newer wooden fence. *Id.* The middle section of fence was built by a prior owner in 1985. *Id.* The McWhorters added the newer section of fence along the rear of the property in 1993, shortly after purchasing the property. *Id.* at 469. They also planted new shrubs along the front section where older shrubs had died. *Id.* The McWhorters asked the MBA for permission to plant the shrubs as "a continuation of the boundary line between [the] two properties," and the MBA agreed and shared in the expenses. *Id.* Eventually, a dispute arose after the MBA learned that the McWhorters' fence encroached on the MBA's property, and the MBA sought a permanent injunction requiring removal of the fence and other encroachments. *Id.* In response, the McWhorters claimed adverse possession of the disputed property for more than ten years. *Id.* The jury found for the McWhorters, and the MBA appealed. *Id.* at 470.

On appeal, the First Court of Appeals considered whether the evidence was sufficient to support a finding of intent to appropriate. *Id.* at 472. In answering that question in the affirmative, the court distinguished *Ellis* and held as follows:

> Here, for over ten years, the MBA did not assert its legal right to the disputed property, and evidence exists that the predecessors in title intended to claim the property as their own. All the parties involved— the MBA, the McWhorters, the predecessors in interest, and [a] neighbor [who testified]—believed that the fence line was the boundary between the two properties. Although the McWhorters did not "intend to take" the MBA's property because they thought that they rightfully owned the land, the [prior owners of 32 Pinedale] and the McWhorters intended to *use* the property *exclusively as their own*—and did use it to the exclusion of the MBA with respect to the middle section. Moreover, even though they may not have consciously intended to deprive the MBA of its title to the land, both [of the prior owners of 32 Pinedale] intended to convey the disputed land to their successor in interest. . . . The jury could have concluded, based on the evidence of the hostile fence that excluded use of the land by the MBA, and the evidence of the predecessors' intent to convey the area within it to a third party, that the predecessors in title did indeed intend to exercise rights to the property that were inconsistent with that of the true owner.

*Id.* at 474. The court ultimately held that legally and factually sufficient evidence supported the jury's finding of adverse possession of the middle section (enclosed by the older fence) for the statutory period, but not the hedge portion or rear section bounded by the new fence.[7] *Id.* at 474–76.

Similarly here, although the Association testified to a lack of intent to encroach upon Lot 35, the Association built a fence to "demark and delineate the

_____

[7] As to the rear section along the garage, the court held that the McWhorters had not adversely possessed that section because "neither a fence nor any other sort of obstruction separated the garage section from the remainder of the MBA's property for the requisite ten years." *Masonic Bldg. Ass'n of Hous., Inc. v. McWhorter*, 177 S.W.3d 465, 475 (Tex. App.—Houston [1st Dist.] 2005, no pet.). Concerning the hedge section, the court concluded that even if a hedge could constitute evidence of a permanent, hostile use, the hedge at issue did not exist for the requisite ten-year period. *Id.* at 476.

property" and "indicate the private property line." No one, other than the Association, had access to any property south of the fence. When the fence was replaced, the Association did not consult the owners of Lot 35 or anyone else for permission, because the Association believed the fence was on its property. Further, the nine-foot fence bears signs stating that parking is for "residents and guests only."

The Texas supreme court has held that hostile use does not require an intention to dispossess the rightful owner, or even knowledge that there is one. *See Tran v. Macha*, 213 S.W.3d 913, 915 (Tex. 2006) (citing *Calfee v. Duke*, 544 S.W.2d 640, 642 (Tex. 1976)). What is required is "an intention to claim property as one's own to the exclusion of all others." *Id.* The Association's use of the disputed Driveway Tract within its fence (first enclosed by the old fence, and still enclosed by the new fence) was to the exclusion of West Harbour's use of the land for more than ten years. *See McWhorter*, 177 S.W.3d at 474. Thus, we hold that the Association presented legally and factually sufficient evidence of intent to appropriate the Driveway Tract.[8]

## D.    Actual, Visible Appropriation

West Harbour also argues that the evidence is insufficient to support a finding of adverse possession because the cinderblock wall encroachment was "too slight" to commence the statutory period of limitations. Stated differently, West Harbour contends that the "less than two-foot-wide, approximately five-foot-long encroachment on Lot 35 was not a visible appropriation of a nature sufficient to give [it or prior owners of Lot 35] any notice" of adverse possession.

---

[8] Again, the Association concedes it does not claim adverse possession of the strip of land between the now-removed cinderblocks and the 2014 fence.

West Harbour's argument focuses on the size of the parcel of land the Association seeks to adversely possess. In support of its argument, West Harbour points us to *McAllister v. Samuels*, 857 S.W.2d 768 (Tex. App.—Houston [14th Dist.] 1993, no pet.). In *McAllister*, this court determined as a matter of law that a nine-inch encroachment on a neighboring lot, delineated by a fence, was "so slight as to be insufficient to put the Samuels on notice of actual, visible appropriation of their land." *Id.* at 777. The encroachment here is 1.62 feet wide, roughly twice as large as the nine-inch encroachment in *McAllister*.[9] We decline to hold, as a matter of law, that such an encroachment by a nine-foot fence is so slight as to be insufficient to put West Harbour on notice of actual, visible appropriation of its land. *See also Levy v. Leach*, No. 14-19-00843-CV, 2021 WL 4165199, at \*7 (Tex. App.—Houston [14th Dist.] Sept. 14, 2021, no pet.) (mem. op.) (distinguishing *McAllister* where fence encroached over eight feet onto adjoining property and enclosed roughly 314 feet; noting that encroachment occurred in area neighbors passed on daily basis and fence was "very, very obvious"). We determine that reasonable and fair-minded jurors could find a visible appropriation under these circumstances, and this finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. We conclude that legally and factually sufficient evidence supports such a finding and overrule West Harbour's second issue in this regard.

Lastly, West Harbour argues that the Association cannot meet its burden to show adverse possession of the strip of land between the original cinderblock wall and the new fence because it "abandoned" that land before the requisite ten-year

---

[9] The Delta Land survey states that the Driveway Tract is 66 square feet or 0.0002 acres. The record does not indicate the square footage of the tract using the Holt Carson boundary line.

20

possession period. We have repeatedly noted the Association's concession on this point. We therefore overrule this portion of West Harbour's second issue as moot.

## E. The Judgment's Description of the Adversely Possessed Property

Regardless of whether the Association sufficiently demonstrated the requisite intent (or any of the other elements of adverse possession), it also needed to prove exactly *what portion of* West Harbour's land it adversely possessed. West Harbour argues that the record evidence does not support the trial court's judgment because the Association's expert based his testimony on the Delta Land survey's common boundary line, not the Holt Carson survey's boundary line stipulated to by the parties. West Harbour further argues that the trial court's judgment is "fatally flawed" due to its incorporation of the Delta Land survey's description of the Driveway Tract because that description does not comport with the evidence presented at trial.

The judgment in an adverse possession case must identify the land with "reasonable certainty" such that an officer charged with the duty of executing a writ of possession could locate the property without exercising judicial functions. *Zobel v. Slim*, 576 S.W.2d 362, 369 (Tex. 1978); *see also Gilbreath v. Yarbrough*, 472 S.W.2d 185, 189 (Tex. App.—Tyler 1971, writ ref'd n.r.e.) (stating that test for sufficiency of description is whether judgment so identifies land that officer charged with duty of executing writ of possession can go on ground and identify it with assistance of competent surveyor). A judgment may refer to other writings in identifying the land in question. *See Rinn v. Wennenweser*, No. 01-07-00763-CV, 2008 WL 2611921, at *2 (Tex. App.—Houston [1st Dist.] July 3, 2008, no pet.) (mem. op.) (citing *Greer v. Greer*, 191 S.W.2d 848, 849 (Tex. 1946)). In reviewing a judgment for sufficiency of property description, Texas law does not require us to scrutinize the conveyance with a view to defeat it; instead, "every reasonable

intendment will be made in their favor, so as to secure, if it can be done consistent with legal rules, the object they were intended to accomplish." *AIC Mgmt. v. Crews*, 246 S.W.3d 640, 645 (Tex. 2008) (quoting *Hermann v. Likens*, 39 S.W. 282, 284 (Tex. 1897)) (internal quotations omitted).

Here, the jury found that the Association had "held the Disputed Driveway Strip in peaceable and adverse possession for a period of at least ten years before June 18, 2021." The charge defined the Disputed Driveway Strip as "the portion of Lot 35 on which the [Association] constructed and maintain a fence and driveway over which the [Association] claim[s] ownership." The trial court rendered a judgment on the adverse possession verdict as follows:

> IT IS further ORDERED, ADJUDGED, AND DECREED that [the Association] own[s] fee simple title to the Driveway Strip described as "Tract 2" in the attached survey labeled as Exhibit A, said survey being the same survey admitted into evidence at trial as PX 15. Defendant West Harbour, LLC's claims to said Driveway Strip have cast a cloud on [the Association's] title, and the Court hereby quiets title in favor of [the Association]. It is therefore ORDERED, ADJUDGED, AND DECREED that Defendant West Harbour, LLC has no right, title, or interest in said strip of land described as "Tract 2" in the attached survey labeled as Exhibit A.

As noted earlier herein, the trial court attached the Delta Land survey to its judgment, which contained the following description of the Driveway Tract):

## DESCRIPTION – TRACT 2

A tract of land situated within the Wilkenson Sparks Survey, Abstract Number 21, Travis County, Texas and within Lot 35E in the Resubdivision of Lots 35E and 36E of Lake Shore Addition according to the map or plat thereof filed for record under Document Number 201900172 of the Official Public Records of Travis County, Texas. Said tract of land being more particularly described by metes and bounds as follows:

**Commencing**, for a tie, at a 60d nail found in Westlake Drive for a corner of the called 0.1426 acre street dedication as shown on the aforementioned Resubdivision, from which a 60d nail found in Westlake Drive for a corner of said called 0.1426 acre street dedication bears N 26°31'51" E a distance of 174.77 feet;

Thence N 81°59'21" W, along the boundary line of the aforementioned called 0.1426 acre street dedication, a distance of 39.87 feet to a point;

Thence S 54°21'09" E, continuing along the boundary line of the aforementioned called 0.1426 acre street dedication, a distance of 60.37 feet to a 60d nail found marking the common corner of said street dedication and the above-mentioned Lot 35E and the Northeast corner of Lot A in Orleans Harbour (as established by the aforementioned Resubdivision) according to the map or plat thereof filed for record in Volume 68 at Page 37 of the Plat Records of Travis County, Texas;

Thence S 54°21'09" E, along the common boundary line of the aforementioned Lot 35E and Lot A, a distance of 427.44 feet to the **Point of Beginning** of the tract of land herein described;

Thence N 54°21'09" W, along the common boundary line of the aforementioned Lot 35E and Lot A, a distance of 81.14 feet to the intersection of the Northeast face of a concrete retaining wall and said common boundary line;

Thence S 55°29'36" E, along the aforementioned Northeast face of a concrete retaining wall, a distance of 81.24 feet to the end of said concrete retaining wall;

Thence S 38°37'03" W, along the aforementioned end of a concrete retaining wall, a distance of 1.62 feet to the **Point of Beginning**.

Said tract of land containing 66 square feet or 0.002 acre, more or less.

While the judgment may sufficiently describe a piece of land by incorporating the survey description above, adverse possession of the parcel described is not supported by the record evidence. First, the Delta Land survey uses "the common boundary line" between the parties of 54°21'09" to describe the Driveway Tract, while the Holt Carson survey agreed to by the parties gives a common boundary line of 52°10'00". Nothing in the record defines the bounds of the adversely possessed tract using the agreed upon boundary line.[10] Second, the Association acknowledges

---

[10] Unlike the Delta Land survey, the Holt Carson survey does not include a description of the disputed tracts.

that it is not claiming adverse possession of the strip of land between the cinderblock wall and new wooden fence on Lot 35's side of the fence. Although the Association's representative confirmed as much in his trial testimony, nothing in the record provides a sufficient legal description of the land that the Association claims it has adversely possessed. The Delta Land survey's description of the Driveway Tract (as incorporated by the judgment) does not appear to reflect the Association's concession as to the land between the cinderblock wall and the wooden fence. As a result, an officer attempting to execute a writ of possession could not identify the adversely possessed Driveway Tract from the trial court's judgment. *See Zobel*, 576 S.W.2d at 369; *Gilbreath*, 472 S.W.2d at 189.

We conclude that the evidence supporting adverse possession of the Driveway Tract as described in the trial court's judgment is so weak and so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *See Dow Chem. Co.*, 46 S.W.3d at 242; *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (stating that courts overturning verdicts on basis of factual insufficiency must explain why evidence discrepancy is "manifestly unjust; why it shocks the conscience; or clearly demonstrates bias"). We sustain West Harbour's second issue as to factual sufficiency, and we reverse and remand for a new trial.

## DECLARATORY JUDGMENT

In its third issue, West Harbour argues the trial court erred in granting the Association's plea to the jurisdiction as to West Harbour's counterclaim seeking a declaration that the boundary line described by the Holt Carson survey is the true and correct location of the boundary between the parties' properties. The Association responds that the trial court correctly granted its plea to the jurisdiction because it

had "agreed to stipulate to" the Holt Carson boundary line and thus no live controversy existed.

"A declaratory judgment is appropriate only if a justiciable controversy exists as to the rights and status of the parties and the controversy will be resolved by the declaration sought." *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995). The Association points to communications between counsel for the parties in which the Association's attorneys indicated that they would stipulate to the boundary or that the boundary was not in dispute. First, these communications do not equate to an enforceable stipulation. As West Harbour explained in its response to the Association's plea to the jurisdiction, "[s]aying 'we are not really going to dispute it' in an email is not the same as judicially admitting or stipulating [to] the actual location of the . . . boundary line as described in the Holt Carson survey." *See Fidelity & Cas. Co. of N.Y. v. McCollum*, 656 S.W.2d 527, 528 (Tex. App.—Dallas 1983, writ ref'd n.r.e.) ("The requirements of an enforceable stipulation are found in Rule 11 of the Texas Rules of Civil Procedure, which provides: 'No agreement between attorneys or parties touching any suit pending will be enforced unless it be in writing, signed and filed with the papers as part of the record, or unless it be made in open court and entered of record.'"). Second, the Association did not acknowledge any such admission in a filing with the trial court until its plea to the jurisdiction filed on June 23, 2022, over seven months after West Harbour first sought a declaration concerning the boundary line and just four months before trial. And still, no signed stipulation was ever filed with the court. *See Elliott v. Crosswater Yacht Club L.P.*, No. 14-15-00034-CV, 2016 WL 1719087, *4 (Tex. App.—Houston [14th Dist.] Apr. 18, 2016, no pet.) (mem. op.) (rejecting appellant's argument that attempted unilateral stipulation on eve of trial as to scope of easement mooted issue and deprived trial court of subject matter jurisdiction).

We also note that despite the purported stipulation, and even after the trial court granted the Association's plea to the jurisdiction on the grounds that no live controversy existed, the Association still presented expert testimony at trial based on the Delta Land survey, which again, reflects a different boundary line. And the trial court's judgment ultimately incorporated that boundary line, not the agreed upon boundary from the Holt Carson survey. All of this confirms the boundary line was still very much in question.

Accordingly, we sustain West Harbour's third issue. We reverse the trial court's grant of the Association's plea to the jurisdiction and remand the cause to the trial court for further proceedings consistent with this opinion.

## CONCLUSION

Applying the precedent of the Third Court of Appeals, we conclude that legally insufficient evidence supports the trial court's finding of an easement by estoppel because no vendor/vendee relationship existed between the parties. We also conclude that the Association failed to present legally sufficient evidence of an affirmative representation of the existence of an easement. We therefore sustain West Harbour's first issue on appeal, reverse the trial court's judgment, and render a judgment that the Association take nothing on its claim for an easement by estoppel.

We conclude that factually insufficient evidence supports the trial court's adverse possession finding. We therefore sustain West Harbour's second issue on appeal, reverse the trial court's judgment, and remand for a new trial on the issue of adverse possession.

We also sustain West Harbour's third issue, reverse the trial court's grant of the Association's plea to the jurisdiction, and remand for further proceedings consistent with this opinion.


/s/     Ken Wise
        Justice


Panel consists of Chief Justice Christopher and Justices Wise and Hassan.